UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff, CIVIL ACTION No.

v. HON.

ERIC C. WAIDELICH,

Defendant.
______________________________________/

**COMPLAINT**

Plaintiff, Securities and Exchange Commission ("Commission"), alleges and states as follows:

**SUMMARY**

1. The Securities and Exchange Commission brings this civil action in connection with violations of the antifraud provisions of the federal securities laws by Defendant Eric C. Waidelich ("Defendant" or "Waidelich"). Defendant was the City Administrator for the City of Allen Park, Michigan ("the City" or "Allen Park") who reported to the City's Mayor and to Allen Park's governing body, the City Council.

2. In 2008 the City began planning an economic development project in the form of a $146 million movie studio ("Studio Project") with eight sound stages, led by a Hollywood executive director. The City intended to support the development in part by $31 million of issuing bonds, which it ultimately did on November 12, 2009 and June 16, 2010 (collectively

"Bonds"). The City initially intended to repay the bond debt service with $1.6 million of revenue from leases at the Studio Project.

3. As the City Administrator, Defendant Waidelich was primarily responsible for executing the City Council's directives, including the plans for the Studio Project and the supporting Bonds.

4. By the time the City issued the Bonds, however, the plans to implement and pay for the Studio Project had deteriorated significantly. None of these changes, however, were reflected in the Bond offering documents nor in any of the City's other public statements.

5. Instead, the Bond offering documents continued to repeat the City's original plans for the Studio Project. In fact, by the time the Bonds were issued, the Studio Project had deteriorated to the point where it was much smaller, consisting of building and operating a vocational school. The deterioration put the City's ability to service the debt for the Bond offering at substantial risk.

6. In addition, in connection with the Bond offerings, the City included outdated budget information which did not reflect Waidelich's knowledge that the City faced a budget deficit for Fiscal 2010 of at least $2 million, or over 8.4% of its total general revenue fund.

7. Waidelich was aware of the deterioration of the scope and viability of the Studio Project as well as of the City's budget deficit. He nonetheless participated in drafting the offering documents for the Bonds which falsely stated that the Studio Project would still be the $146 million, full-service facility with eight sound stages, led by the Hollywood executive.

8. Through the activities alleged in this Complaint, Defendant Waidelich, directly or indirectly, engaged in transactions, acts, practices or courses of business which constitute

violations of Section 17(a)(2) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)(2)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. §240.10b-5(b)] promulgated thereunder.

**DEFENDANT**

9. Defendant Eric C. Waidelich, age 46, resides in the City of Allen Park, Michigan and was employed by the City as its City Administrator from November 2007 to March 2011.

**JURISDICTION**

10. This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Venue is proper in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

11. The acts, transactions, practices, and courses of business constituting the violations alleged herein have occurred within the jurisdiction of the United States District Court for the Eastern District of Michigan and elsewhere.

12. Defendant Waidelich, directly and indirectly, made use of the means and instrumentalities of interstate commerce, the means and instruments of transportation and communication in interstate commerce, and the mails, in connection with the acts, transactions, practices and courses of business alleged herein.

**FACTS**

**Background**

13. The Allen Park City Administrator was responsible for running the City's daily operations including preparing and submitting annual budgets to the City Council, and carrying

out City Council directives. The City Administrator was required to report to the City Council on "any and all matters" that "may require the Council's attention and action" and to perform "such other duties as may be prescribed . . . by ordinance or by direction of the Council."

14. The City of Allen Park is located 13 miles from the City of Detroit, Michigan. It previously has been governed by a City Council consisting of six elected members and the Mayor. The City is currently in receivership and was governed by an Emergency Manager whose appointment expired at the end of September 2014. After the Emergency Manager departed, a Receivership Transition Advisory Board (RTAB) consisting of members appointed via a final Order of the Emergency Manager was installed to oversee the transition of the City to home rule. The City ultimately will return to being governed by a seven-member City Council.

15. In April 2008 the State of Michigan enacted legislation that provided significant tax credits to film studios conducting business in Michigan. In August 2008 the City was approached by an owner and operator of a California film and post-production sound studio ("Producer") who inquired about building the Studio Project in the City.

16. The City Council believed that the Studio Project would bring much-needed economic development to the City. To support the Project, the City Council therefore agreed to offer what ultimately became a total of $28.275 million of general obligation limited tax bonds issued on November 12, 2009 ("2009 Bonds") and another $2.725 million of general obligation limited tax bonds issued on June 16, 2010 ("2010 Bonds").

**<u>The Public Private Partnership</u>**

17. The City and the Producer planned that the Studio Project would be financed and built through a Public Private Partnership ("PPP"), consisting of a limited liability corporation

with the City, the Producer and a private developer ("Developer") as members. The City would use the municipal bond proceeds to buy land which it then would donate to the PPP to use for the Studio Project. The Developer would finance and build necessary structures on the land while the Producer would manage the Project and find investors to fund the film production.

18. In April 2009 the City issued a press release that included relevant plans about the Studio Project. These plans, which the City then maintained on its website through at least June 2010, were that the Studio Project would be a full-service film and media production facility that would employ thousands of union and skilled workers, be located on 104 acres, consist of 750,000 square feet of facilities, have eight sound stages, and be led by a Hollywood production executive, at a cost of $146 million.

19. In May 2009, as Defendant Waidelich was preparing the City's Fiscal 2010 budget, the City faced a deficit of approximately $2 million. The Producer offered to provide up to $2 million to remove the deficit. Although Waidelich originally understood the $2 million would be a "financial gift," the Producer sent Waidelich a letter on May 14, 2009, stating that the $2 million was a "capital repayment" contingent on the City's contribution of land to the PPP.

20. In early June 2009, the Producer, the City, and the Developer signed an agreement for the PPP, pursuant to which the Developer committed $20 million for the Project's first phase.

**The Collapse of the PPP and the City's $2 Million Budget Shortfall**

21. In July 2009 the City's bond counsel advised the City that bond proceeds could not be used to purchase land that then would be donated to the PPP.

22. Because the City could not donate assets purchased with bond proceeds, it could not meet the contribution requirements necessary for membership in the PPP. As a result, the

plans for the PPP collapsed. The collapse of the PPP meant that the Developer, who had pledged to contribute $20 million, no longer had any obligations to the Studio Project.

23. The collapse of the PPP also meant that the City had a projected deficit for Fiscal 2010 of $2 million, because the Producer no longer was obligated to pay the City $2 million. Although Defendant Waidelich knew this, he took steps to create the false impression that the City would still receive the $2 million. The $2 million purported "donation" represented 8.4% of the City's budgeted $22 million in Fiscal 2010 revenue and was instrumental in creating the false appearance that the City's budget for Fiscal 2010 had no deficit.

24. In addition, the Producer's proposal to attract investors, media producers and tenants for the Studio Project had been based on the assumption that he would manage and control the entire Project. When the PPP collapsed, however, the City decided to own and manage the property itself. By August 2009, the plan was that the Producer was only going to lease 100,000 square feet and to operate a vocational school to train potential workers in the movie production business.

**Wayne County and the City's Public Statements**

25. Wayne County originally planned to support the Studio Project by issuing up to $12 million of municipal bonds and granting favorable tax status to the Studio Property. The County, however, raised numerous concerns about the viability of the Project from the start, expressing these concerns in writing and meetings with both Defendant Waidelich and the City's mayor.

26. By August 2009, the County informed the City that it would not grant favorable tax status to the property.

27. The City nevertheless issued a press release on August 14, 2009 which announced that ground breaking for construction was beginning at the Studio Project, that all Studio Project details, including financing, were complete and that the "all-encompassing film, TV and media production facility will open in October." None of these statements was true.

28. In late September 2009, the County further advised the City that it would not issue the $12 million municipal bonds without additional information. Defendant Waidelich advised the mayor that without the County's municipal bonds, the City could incur up to $4 million of additional interest. On October 6, 2009, the County confirmed that it would not provide any municipal bond financing for the Studio Project.

29. In response to concerns raised by a resident during an October 13, 2009 public City Council meeting, neither the mayor nor Defendant Waidelich discussed any of the negative developments that were impairing the Studio Project, including the fact that there were no prospects for building sound stages.

30. Thus, the City's plan for the Studio Project deteriorated significantly between April 2009, when the City issued its first press release, and November 12, 2009, when the City issued the 2009 Bonds totaling $28.275 million. By the time the 2009 Bonds were issued, the City no longer had any private investor money in place to build or develop the Studio Project and the Producer no longer had the ability to lead the development or attract investors.

**The 2009 Bond Documents Did Not Disclose Material Negative Information**

31. Defendant Waidelich was the primary source of the information used in drafting the offering documents for the 2009 Bonds. Waidelich received drafts of the offering documents and provided comments that were incorporated into the final versions. Waidelich's electronic

signature certified the offering documents on behalf of the City, stating that to the City's best knowledge and belief, the document was "true and correct" and did not "contain, nor omit, any material facts or info which would make the statements contained herein misleading."

32. The offering documents, however, did not disclose any of the adverse developments regarding the Studio Project. Similarly, the Offering Statements contained no disclosure or discussions regarding any potential risks.

33. In fact, the offering documents contained a number of material misstatements. First, the offering documents for the 2009 Bonds repeated all of the information about the Studio Project that had been contained in the City's initial April 2009 press release announcing the Project, even though the plans for the Studio Project had deteriorated significantly after April 2009.

34. In addition, the offering documents stated that the City intended initially to repay the Bonds by leasing facilities at the Studio Project and using the lease revenues towards payment of the Bonds. This representation was highly relevant to the City's ability to service its debt since the expected annual debt service otherwise would have constituted approximately 10% of the City's budget. The offering documents also stated that the City had existing leases "under contract" totaling $1.6 million for 48% of the available space and that additional lease arrangements, representing 27% of the available space, were currently in negotiation.

35. By the time the 2009 Bonds were issued, however, the projected $1.6 million of annual lease revenue included at least $300,000 from the Producer which Waidelich knew was uncertain. Defendant Waidelich also was aware that there were no existing negotiations regarding 27% of available space.

36. Finally, the City attached its projected Fiscal Year 2010 budget as an appendix to both its 2009 and its 2010 offering documents. The budget, which reflected the City's expectation that it would have a general fund surplus at the end of Fiscal Year 2010, appeared to be balanced because it was based on the assumption that the Producer would donate $2 million to the City. Waidelich, however, knew that the Producer no longer intended to pay $2 million to the City. The budget attached to the offering documents thus was materially misleading. The City really faced a projected $2 million deficit for Fiscal Year 2010.

**The Bonds were rated "A" and Issued in November 2009**

37. Standard & Poor ("S&P") reviewed information provided by the City and others in order to rate the City's 2009 Bonds. Waidelich did not inform S&P that the Producer no longer intended to pay $2 million to the City and thus misled S&P regarding the actual condition of the City's Fiscal Year 2010 budget.

38. On October 20, 2009 Standard & Poor ("S&P") assigned the 2009 Bonds an "A" rating. S&P's write-up noted that the FY 2010 budget was balanced only because of the $2 million donation, and pointed out that the City would have to address this structural imbalance.

39. The "A" rating by S&P was material to investors who purchased the 2009 Bonds.

**Additional Adverse Developments Occurred Before the City Issued its June 2010 Bonds**

40. After the 2009 Bonds were issued, the City retained a company to manage the Studio Project site. On February 12, 2010, the management company advised that the City would experience a significant decrease in net cash flow at the site at least for the first three years, rather than the increase from lease revenues it had expected. This was due to hiring agents

to solicit prospective tenants, management companies, providing rent forgiveness and building out properties.

41. On May 6, 2010 the City served the Producer with an eviction notice. The City and the Producer then negotiated an amended lease for only one-half the amount of space at one-half the price, with rent payments postponed until August 2010.

42. Despite these additional significant negative developments affecting the Studio Project, the City issued the 2010 Bonds on June 16, 2010. Although two weeks before the 2010 Bonds were issued, the City Council had adopted a budget for Fiscal Year 2011 which acknowledged the $2 million budget shortfall, the offering documents for the 2010 Bonds again incorporated the City's Fiscal 2010 budget figures which omitted the $2 million shortfall.

43. The 2010 Bond offering documents misleadingly continued to list tenants at the Studio Property with purported "total leases under contract represent[ing] approximately $1.6 million of annual revenue." The 2010 Bond offering documents stated that the total annual debt service was $2.6 million, an increase from the $2.2 million stated in the 2009 Bonds.

44. Finally, notwithstanding that the Producer by this time had reduced his presence at the Studio Project by half, the offering documents falsely continued describing the Studio Project as a "$146 million, full-service movie, television and new media production studio" that would consist of 750,000 square feet, eight sound stages, employ thousands of unionized skilled workers, and be managed by the Producer.

45. Defendant Waidelich again was the primary source of information for the 2010 Bond offering documents. He also reviewed and approved them and certified, on behalf of the City, that, to the City's best knowledge and belief, the document was "true and correct" and did

not "contain, nor omit, any material facts or information which would make the statements contained herein misleading."

46. On September 29, 2010 the Producer advised the City that he was terminating his lease at the Studio Property. He vacated the site on October 4, 2010. Defendant Waidelich resigned on February 27, 2011.

**The Effect of the Studio Project Collapse on the City**

47. The collapse of the Studio Project had a significant impact on the City's financial condition. The City filed a notice on the Electronic Municipal Market Access system ("EMMA") on December 29, 2010 that it was not filing an annual report for fiscal year 2010.

48. On March 8, 2011 S&P downgraded the City's unlimited tax bonds and its limited tax GO bonds to BB+.

49. The City did not file any continuing disclosure until January 4, 2012, at which time it announced it had received a "going concern" opinion from its auditors. On June 21, 2012 the Michigan State Treasurer began a Preliminary Review of the City, pursuant to State law, and issued a Final Report on August 8, 2012 recommending the appointment of an Emergency Manager. The Studio Project was listed as a primary factor in the City's deteriorating economic condition. An Emergency Manager was appointed in October 2012.

50. The City's most recent annual audit report, dated December 16, 2013, for Fiscal 2013, again includes a going concern opinion because of the City's general fund deficit of $694,185 and its Studio Project fund deficit of $10,370,611.

## CLAIMS FOR RELIEF

## COUNT I

**Violations of Securities Act Section Act 17(a)(2)**
**[15 U.S.C. Section 77q(a)(2)]**

51. Paragraphs 1 through 50 are re-alleged and incorporated herein by reference.

52. By his conduct as alleged above, Defendant Waidelich, in the offer and sale of municipal securities, by the use of means and instruments of transportation or communication in interstate commerce and by use of the mails, directly and indirectly, obtained money or property by means of untrue statements of material fact or omissions to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

53. Defendant Waidelich was reckless or negligent in the activities described herein.

54. By reason of the foregoing, Defendant Waidelich violated, and unless enjoined will likely again violate, Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

## COUNT II

**Violations of Exchange Act Section 10(b) and Rule 10b-5(b)**
**[15 U.S.C. Section 78j(b)] and 17 C.F.R. Section 240.10b-5]**

55. Paragraphs 1 through 50 are re-alleged and incorporated herein by reference.

56. By his conduct as alleged above, Defendant Waidelich, in connection with the purchase and sale of municipal securities, by the use of means and instruments of transportation or communication in interstate commerce and by use of the mails, directly and indirectly, made

untrue statements of material facts and omitted to state material facts necessary in order to make statements made, in the light of circumstances under which they were made, not misleading.

57. Waidelich, at a minimum, acted recklessly in the activities described herein.

58. By reason of the foregoing, Defendant Waidelich violated, and unless enjoined will likely again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

**RELIEF REQUESTED**

**WHEREFORE,** the Commission respectfully requests that the Court enter a judgment:

A. Permanently enjoining Defendant Waidelich, his agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from further violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] promulgated thereunder;

B. An Order pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)] permanently barring Defendant Waidelich from participating in an offering of municipal securities, as defined in Section 3(a)(29) of the Exchange Act [15 U.S.C. § 78c(a)(29)], including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any municipal security, *provided*, however, that such injunction shall not prevent Defendant Waidelich from purchasing or selling municipal securities for his own personal account;

C. Retaining jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and to carry out the terms of all

orders and decrees that may be entered or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court; and

    D.  Granting such further relief as the Court may deem appropriate.

Date:  November 6, 2014                      Respectfully submitted,

                                                  s/ Sally J. Hewitt
                                                  John E. Birkenheier (Illinois Bar No. 6270993)
                                                  Sally J. Hewitt (Illinois Bar No. 6193997)
                                                  Counsel for Plaintiff U.S. Securities
                                                  and Exchange Commission
                                                  175 West Jackson Blvd., Suite 900
                                                  Chicago, IL  60604
                                                  (312) 353-7390